Opinion by
Mr. Justice Groves.
This is a proceeding under Colo. R. Crim. P. 35(b) involving a request for post conviction relief. In Roberts v. People, 158 Colo. 76, 404 P.2d 848, we remanded this matter for a hearing, which has now been held before a judge who had not previously participated in the case. The requested relief was denied and the petitioner, Harry Roberts, is here again on writ of error.
On May 15, 1961 petitioner was charged with first degree murder and was held in the former La Plata County jail. Counsel was appointed to represent him. The partner of the appointed attorney assisted him in investigation and preparation for trial. These two attorneys are referred to herein as “counsel” and the appointed attorney as the “attorney.”
On May 21, 1961 pleas of not guilty and not guilty by reason of insanity were entered and the petitioner spent the following 30 days in Denver undergoing examination at Colorado Psychopathic Hospital. He was returned to the La Plata County jail on June 24, 1961, at which time the matter was set for trial to commence on August 22, 1961. Counsel, after extensive investigation and preparation, concluded that there was a strong possibility that a jury would find the petitioner guilty of first degree murder and assess the death penalty. After many conferences, on or about August 17, 1961 *117 counsel were finally successful in persuading the district attorney to accept a plea of guilty to second degree murder. The petitioner then changed his plea to guilty of second degree murder and was sentenced to serve a term of 99 years to life.
Following the opinion on the former writ of error the trial court appointed the Public Defender of the 6th Judicial District to represent the petitioner, and he has so acted at the hearing and here. He is referred to herein as the public defender. He urged unsuccessfully at the hearing — and has also presented here — the following arguments:
1. The petitioner’s constitutional right to due process was violated because of the conditions of his confinement, which unduly induced him to plead guilty to second degree murder.
2. The petitioner’s mental condition was such that he could not intelligently and voluntarily make this plea, and the explanation of its consequences were not fully explained to him.
Reverting to 1961, counsel concluded that the only defense that might have a probability of success was that of insanity. The report from the Colorado psychopathic hospital was that the petitioner was sane. Counsel employed a psychiatrist at their own expense, who reached a conclusion that petitioner was legally sane. The petitioner had resided in California and Nebraska. At their own expense the attorney went to California and his law partner went to Nebraska to acquire background information and facts which might support a conclusion of petitioner’s legal insanity. They submitted the information gathered to the different psychiatrists who had examined petitioner, but it was all to no avail. Counsel spent 313 hours in investigation and preparation and, when they were obliged to admit to themselves defeat as to the proposed defense of insanity, they cast their, persuasive qualities toward the district attorney in their attempt — ultimately successful — to convince *118 him that a guilty plea to second degree murder should be received.
From the time the petitioner was returned from Denver on May 18, 1961 until August 17, 1861, when he withdrew his pleas of not guilty and not guilty by reason of insanity and entered a plea of guilty to second degree murder, he was kept in the maximum security cell of the La Plata County jail, known as the “hole.” This cell had metal walls and little ventilation. It was — and was permitted to remain — in a filthy, malodorous condition. In his findings, the judge who presided at the hearing referred to it as being only one step removed from the Black Hole of Calcutta.
The petitioner testified to the following effect:
His appointed attorney had told him that the district attorney “was getting ready to give me the pill” [meaning the pellet used in the gas chamber]. On August 17, 1961 and prior thereto the attorney told him that the trial would drag on for 6 to 8 weeks, which would anger the judge. On the day that he entered his guilty plea and prior thereto his appointed attorney and the district attorney conferred with him at the county jail. He was advised that the district attorney would ask the court to accept a plea of guilty to second degree murder. The district attorney said to him, “Harry, if you change your plea to guilty of second degree murder I will assure you that you will get ten years to life, and you will get probation in five years.” His attorney “told me that I had better grab it” and said that this would amount to five years. His attorney said that the district attorney wanted an answer right away. The jail was getting intolerable and he couldn’t stand much more of it. The sentencing judge told him, “I must warn you that this sentence carries ten to life.” His impression was that the judge knew about the promise the district attorney had made to him. If he had known that he was going to get more than a minimum of ten years, he would not have changed his plea.
*119 The people called as witnesses — counsel, the district attorney and the sentencing judge. Counsel each testified that the petitioner never communicated the thought that the reason for his change of plea was because of the conditions of his confinement. The attorney and district attorney categorically denied that there was ever any conference of them and the petitioner; and the district attorney stated that he never spoke to the petitioner at any time after the appointment of counsel. The attorney testified that he recommended that petitioner change his plea and he continued:
“and I also told [petitioner] that [the district attorney] was going to make an effort to get him imprisoned for the rest of his natural life, and that I had agreed to put on this information as to his background, but I told him that this didn’t necessarily bind the Judge. I told him that the Judge might give him a lesser sentence than life, that he might sentence him for, 40 years — I believe I used that figure — in which event he would get out earlier, but that there was no way we could assure him of this.”
He further testified that he did not make the statement about the length of trial and thought it was to have taken a much shorter time than six weeks.
The sentencing judge did not ask nor receive any recommendations from the district attorney. This judge testified:
“After the plea of guilty to the charge of second degree murder was announced, I said to Mr. Roberts, ‘Before the Court can accept this plea of guilty it is my duty to inform you of the consequences of such a plea. In this particular case you are subject to punishment in the State Penitentiary for a term of not less than ten years and which may extend to life. You will understand that this means any term within ten years and up to life. That is, the minimum may be a term of ten years, fifteen years or whatever the Court decides, and the maximum, *120 of course, is life, but it must be some period between ten years and life.’ ”
On one occasion petitioner requested his attorney to attempt to obtain his removal from the maximum security cell; and in this the attorney was unsuccessful. There was no other testimony that he complained about jail conditions and the sheriff testified the petitioner never complained to him.
Counsel each testified to the effect that the petitioner had the delusion that the female victim of the homicide was still alive and that there was one area (presumably members of the female sex) in which, with “the proper set of stimuli,” petitioner would become irrational. Each further testified that the consequences of the plea of guilty to second degree murder were fully explained in advance to the petitioner, and each expressed the opinion that petitioner fully understood the possible consequences of such a plea. One stated that he regarded the petitioner as mentally competent to make an independent judgment as to whether or not he should enter a guilty plea to second degree murder. The sentencing judge testified,
“I think he understood at that time and he understands now the nature and consequences of the plea he entered at that time.”
Following the hearing the court made detailed findings of fact. In essence, it concluded: that no promises as to the amount of sentence were made to petitioner; that, particularly considering that at the time of the plea his trial was only five days away, the conditions in the;jail had nothing to do with his decision on advice of counsel to enter the plea of guilty; and that, while petitioner apparently has had mental illness of an intermittent nature, eminent- psychiatrists found that he was legally sane, i.e., that he had the ability to distinguish between right and wrong; that his mental illness did not interfere with his ability to make an informed and intelligent plea, of guilty; and that petitioner enjoyed protection of *121 Ms rigMs and due process of law at every stage of the proceedings.
The record amply supports the findings and conclusions of the court.
 The extent of the effect of the conditions at the jail upon the petitioner is an entirely subjective thing; and this is borne out by the fact that while confined there he made virtually no complaint or objection to the fetid conditions. The credibility of the petitioner’s testimony was a matter within the province of the trial court, and it was fully justified in not accepting the petitioner’s testimony in this particular.
The public defender has suggested that under Brooks v. Florida, 389 U.S. 413, 88 S.Ct. 541, 19 L.Ed.2d 643, we should find as a matter of law that the plea of guilty was involuntary. The situations in the two cases are so dissimilar that we are unable to agree.
Also it is urged upon us that under Machibroda v. United States, 368 U.S. 487, 82 S.Ct. 510, 7 L.Ed.2d 473, we should find that an inadequate explanation was made to petitioner concerning the consequences of Ms guilty plea. On the contrary, as already indicated, we hold that the finding otherwise was supported quite adequately by the evidence.
The public defender believes that error was made in the conclusion that petitioner’s free will and mind had not been unduly induced, and he cites Garrity v. New Jersey, 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562; Collins v. State, 197 So.2d 574 (Fla. App.); and Williams v. State, 188 So.2d 320 (Fla. App.). We find the facts of these cases distinguishable. We note in passing that Collins was the subject of later opinions to be found in 201 So.2d 225, 203 So.2d 28, 207 So.2d 430, and that a later opinion in Williams appears in 198 So.2d 21; but these subsequent opinions made no changes in the originals so far as the point involved here is concerned.
The petitioner has been accorded due process and, it might be remarked also, that throughout the proceedings *122 he has been ably represented by competent and dedicated counsel.
Judgment affirmed.
Mr. Chief Justice McWilliams, Mr. Justice Day, and Mr. Justice Hodges concur.